AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of New Jersey

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| ELVIS SONSON | ) | Case No. |
| | ) | Mag. No. 25-mj-17024 (SAK) |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____(set forth below for each count)____ in the county of ____Camden and elsewhere____ in the ____ District of ____New Jersey____, the defendant(s) violated:

| Code Section | Description of Offenses |
|---|---|
| Count 1: 21 U.S.C. § 846 (contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)) | See Attachment A. |
| | Dates for Count 1: June 2024 to October 2024 |
| Count 2: 18 U.S.C. § 1349 (contrary to 18 U.S.C. § 1344) | Dates for Count 2: November 2024 to April 2025 |
| | Date for Count 3: April 22, 2025 |
| Count 3: 18 U.S.C. § 1512(c)(1) | |

This criminal complaint is based on these facts:

See Attachment B.

☑ Continued on the attached sheet.

*Michael Bowman* (signature)
*Complainant's signature*

FBI Special Agent Michael Bowman
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____05/05/2025____

*Sharon A. King* (signature)
*Judge's signature*

City and state: ____Camden, New Jersey____

Hon. Sharon A. King, U.S. Magistrate Judge
*Printed name and title*

CONTENTS APPROVED

UNITED STATES ATTORNEY


By: */s/Jeffrey B. Bender*
Jeffrey B. Bender, Assistant U.S. Attorney

Date: May 5, 2025

**ATTACHMENT A**

**COUNT ONE**

(Conspiracy to Distribute Fentanyl)

Beginning at least as early as in or about June 2024 to in or about October 2024, in Camden County, in the District of New Jersey and elsewhere, the defendant,

ELVIS SONSON,

knowingly and intentionally conspired and agreed with Co-Conspirator 1 and others to distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[ 1-( 2-phenylethyl ) -4-piperidinyl ] propenamide ("fentanyl"), a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

In violation of Title 21, United States Code, Section 846.

**COUNT TWO**

(Conspiracy to Commit Bank Fraud)

Beginning at least as early as in or about November 2024 to in or about April 2025, in Camden County, in the District of New Jersey and elsewhere, the defendant,

ELVIS SONSON,

did knowingly and intentionally conspire and agree with Co-Conspirator 2 and others to execute and attempt to execute a scheme and artifice to defraud a financial institution and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

In violation of Title 18, United States Code, Section 1349.

## COUNT THREE

(Tampering with Evidence)

On or about April 22, 2025, in the District of New Jersey and elsewhere, the defendant,

ELVIS SONSON,

did corruptly alter, destroy, mutilate, and conceal records, documents, and other objects, and attempt to do so, with the intent to impair their integrity and availability for use in an official proceeding.

In violation of Title 18, United States Code, Section 1512(c)(1).

**ATTACHMENT B**

I, Michael Bowman, am a Special Agent with the Federal Bureau of Investigation. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, photographs, and recordings of the evidence. Where statements of others are related herein, they are related in substance and part. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date and time, I am asserting that it took place on or about the date and time alleged.

Background

1.      Since June 2024, the FBI has conducted multiple controlled drug purchases of fentanyl and stolen checks from ELVIS SONSON ("SONSON") and his co-conspirators through the use of a confidential human source (hereinafter "CS").[1]  At all times described in this affidavit, the CS acted at the instruction and under the direction of the FBI in conducting each of the below-described transactions.

2.      The transactions described below were conducted in a similar manner. Before each transaction was conducted, law enforcement officers: (a) met with the CS in a prearranged location; (b) provided the CS with a transmitting/recording device; (c) searched the CS and the CS's vehicle for both money and contraband, with negative results; and (d) surveilled the CS as the CS traveled to and from the meeting location.  Similarly, after each deal was conducted, law enforcement officers: (a) met with the CS in a prearranged location; (b) retrieved the transmitting/recording device; (c) took all of the drugs/checks purchased in the transaction; (d) debriefed the CS on what had occurred during the transaction; and (e) searched the CS and the CS's vehicle for both money and contraband, with negative results.

Drug Distribution with Co-Conspirator 1 ("CC-1") on June 25, 2024

1.      On June 25, 2024, SONSON engaged in a series of communications with the CS during which he arranged to sell the CS 800 fentanyl-laced pills for $3.50 per pill (*i.e.*, $2,800).

---

[1]      The CS has pending charges related to controlled substances.  Agents have been able to corroborate information provided by the CS through records, surveillance, and other investigative actions.  The CS, therefore, is reliable and credible.

1

2.      During the transaction, SONSON directed the CS to Webster Avenue in the Bronx, New York. After the CS arrived at Webster Avenue, SONSON told the CS that another person would be coming to give the CS the pills.

3.      The person who was supposed to deliver the drugs did not show up for approximately 1 hour. SONSON and the CS had additional communications regarding the arrival of the drugs. SONSON then directed the CS to go to another location in the Bronx, New York. Shortly after the CS arrived at the new location, the CS retrieved the fentanyl-laced pills from a person who was unknown to the CS but later identified by law enforcement officers and identified herein as CC-1.  In the post-transaction meeting with the CS, law enforcement officers showed the CS a photograph of CC-1, and the CS positively identified the man depicted in the photograph as the person who had supplied him with the drugs.

4.      On June 25, 2024, SONSON sent a series of texts to CS which included payment instructions, stating in relevant part: "2,800," "Only 800 pills," "[Digits Redacted]-0355" and "Zeller." A review of the CS's June 25, 2024 communications with SONSON identified a three-way call between SONSON, CS and CC-1 in which they were trying to coordinate the meeting.

5.      The next day, June 26, 2024, I met with the CS and provided the CS with $2,800 to pay for the drug obtained the prior day. I accompanied the CS to the CS's bank in New Jersey while the CS deposited the money into the CS's bank account. I was with the CS when the CS sent CC-1 $2,000 via Zelle. The transaction generated a receipt which displayed the amount of the transaction and the name of the recipient as $2,000 to "CC-1." After sending the money, the CS's account could see the telephone number affiliated with CC-1's account, which was XXX-XXX-0355, which I am aware is a phone number affiliated with CC-1. The CS thereafter sent screenshots of the receipt and the cell phone number affiliated with CC-1 to me.

6.      On June 27, 2024, the CS sent another $800 to CC-1 via Zelle, which was the remaining amount owed for the provided fentanyl-laced pills. The CS provided me a screenshot of a Zelle receipt, which showed $800 being paid to an account affiliated with telephone number XXX-XXX-0355.

7.      The 831 tablets obtained by the CS from CC-1 were light yellow tablets stamped "10/325"on one side and "E 712" on the other side, so that they appeared to be Encodet (which is a combination of acetaminophen and oxycodone prescribed for pain treatment).  The tablets were sent to the DEA Northeast Regional Laboratory and determined to be a substance and mixture containing a detectable amount of fentanyl, xylazine and acetaminophen, weighing approximately 368.83 grams.

Drug Distribution via U.S. Mail in August 2024

8.    On August 20, 2024, SONSON engaged in a series of communications with the CS during which SONSON arranged to ship 500 fentanyl-laced pills to the CS in return for $1,750.

9.    On August 21, 2024, SONSON texted the CS a photograph of a United States Postal Service receipt identifying the expected delivery date of a package as August 24, 2024 in Camden, New Jersey.

10.    On August 22, 2024, the CS sent $875 to SONSON via CashApp to SONSON's CashApp name, "$ellsonson," as directed by SONSON.

11.    On August 24, 2024, SONSON sent a series of text messages to the CS, including the following: "It's in South Jersey, you should have it Monday." The CS responded by text on August 26, 2024, stating: "I got it already . . . ." SONSON responded: "Yo bro can you send the other $875 so I can square dude up. I been up since yesterday about to go to bed." Based on my training and experience, I believe that SONSON meant that he had to pay his drug supplier when he asked the CS for the additional $875 so that he could "square dude up."

12.    On August 27, 2024, the CS sent $875 to SONSON at "$ellsonson" via CashApp.

13.    The 489 tablets obtained by the CS were blue tablets stamped "M" on one side and a "30" on the other side, so that they appeared to be 30 mg Oxycodone Hydrochloride (which is prescribed for pain treatment). The tablets were sent to the DEA Northeast Regional Laboratory and determined to be a substance and mixture containing a detectable amount of fentanyl and acetaminophen, weighing approximately 51.24 grams.

Drug Distribution in Person on October 18, 2024

14.    On October 18, 2024, SONSON engaged in a series of communications with the CS during which SONSON advised the CS that he was coming to the southern New Jersey area shortly and wanted to meet with the CS.

15.    Law enforcement officers met with the CS in Camden County, New Jersey, and provided the CS with $2,000 in U.S. currency and an FBI recording/transmitting device. The CS then communicated over the phone with SONSON, and SONSON indicated that he was in a white Honda Accord. Seconds later, law enforcement officers conducting physical surveillance observed the CS meet with SONSON next to a white Honda. During the meeting, law enforcement officers—using electronic surveillance—overheard SONSON direct the CS to retrieve a bag from the rear floor of the white Honda.

3

16.    Immediately following the meeting between the CS and SONSON, law enforcement officers met with CS, who returned the recording device and provided the officers with approximately 727 of fentanyl-laced pills, which the CS stated that he had retrieved from the back of SONSON's white Honda.

17.    After the meeting, law enforcement officers reviewed the recording of the meeting between the CS and SONSON, which confirmed that SONSON sold the aforementioned pills to the CS for $2,000 in cash. SONSON confirmed that the pills that the CS bought on October 18, 2024 were the same type of pills that the CS had obtained on June 25, 2024, when he stated: "they are the same ones from before" in response to the CS's statement that "they [the pills] look good."

18.    The 727 tablets obtained by the CS from SONSON were light yellow tablets stamped "10/325"on one side and "E 712" on the other side, similar to the tablets previously obtained on June 25, 2024.  The tablets were sent to the DEA Northeast Regional Laboratory and determined to be a substance and mixture containing a detectable amount of fentanyl, xylazine, and acetaminophen, weighing approximately 317.83 grams.

## SONSON's Bank Fraud Scheme

19.    In addition to distributing drugs to the CS, SONSON also sold stolen U.S. Treasury checks to the CS as part of a conspiracy with others to defraud financial institutions by negotiating, causing to be negotiated, and aiding others in negotiating stolen U.S. Treasury checks.

20.    On November 1, 2024, SONSON conducted a series of consensually recorded audio and text communications with the CS. During the communications, SONSON asked the CS to send him a mailing address and explained that he would send the CS a check for the CS to attempt to cash. During prior unrecorded and recorded conversations which occurred on or about October 30 and 31, 2024 SONSON told the CS that SONSON, was working on sending CS a check but needed CS to provide an address because the checks could expire.

21.    SONSON directed the CS to send SONSON half the amount of the check upon cashing.  SONSON then texted the CS a photograph of a United States Postal Service receipt identifying an expected date of delivery of November 2, 2024.

22.    On November 4, 2024, the CS received a United States Postal Service package at the address in Camden, New Jersey, that the CS had provided to SONSON. Affixed on the package was a shipping label which identified the sender's address as [Redacted] Tigers Flowers Drive, Atlanta, Georgia. Inside the

package was a United States Treasury check in the amount of $7,656, bearing the name of Victim 1 and Victim 1's mailing address in Washington, DC.

23.     On November 7, 2024, the CS sent $2,000 to SONSON at "$ellsonson" via CashApp. After sending the money, the CS sent the following message to SONSON: "Yo bro send me some more same address," to which SONSON responded: "Bro I need the rest of that money!!!"

24.     On November 10, 2024, the CS sent $1,500 SONSON at "$ellsonson" via CashApp.

25.     During consensually recorded communications on December 2, 2024, SONSON told the CS that SONSON had spoken with an individual identified herein as Co-Conspirator 2 ("CC-2"), who would speak with the CS further regarding fraudulent checks.  In a separate conversation, CC-2 requested cash from the CS in exchange for CC-2 providing the CS Social Security numbers that would be needed to negotiate the fraudulent checks.

26.     On December 4, 2024, SONSON texted the CS images of 10 purportedly stolen United States Treasury checks, and later the same day, CC-2 met with the CS and provided one of the stolen Treasury checks to the CS.

27.     During additional conversations beginning in January 2025 and continuing through April 2025, SONSON indicated to the CS that SONSON would continue negotiating stolen checks using fake identifications.

### Evidence Tampering

28.     A federal grand jury in the District of New Jersey has been investigating SONSON for, among other offenses, the drug distribution and fraud conspiracies described above.  As part of the investigation, an FBI agent applied for a warrant to search SONSON in order to seize his cellphone, which the Honorable Matthew J. Skahill, United States Magistrate Judge, authorized on April 21, 2025.

29.     On April 22, 2025, FBI agents approached SONSON at the Middlesex County Courthouse in New Brunswick, New Jersey, for the purpose of executing the warrant to seize SONSON's cellphone.  The agents identified themselves to SONSON as FBI agents and told SONSON that they had a warrant to seize his cellphone.

30.     SONSON indicated to the agents that he needed to locate a date in his cellphone that was necessary to provide to the judge for the hearing for which SONSON was at the courthouse.  The agents permitted SONSON to maintain possession of his cellphone in order to locate this information.  While SONSON was in the presence of the agents, the agents observed SONSON manipulating

5

his cellphone in a manner consistent with deleting information, as opposed to merely locating a date. Agents proceeded to seize the cellphone from SONSON.

31. On April 24, 2025, SONSON met with the CS. In a recorded conversation, SONSON told the CS that he "attempted to delete [his] app and shit" from his cellphone after being approached by agents. SONSON also told the CS that SONSON attempted to destroy evidence in his car after the encounter with agents: "I went to the car. I ripped everything up. I bought a lighter and shit and burned that shit."

Respectfully submitted,

Michael Bowman
FBI Special Agent

Pursuant to Fed. R. Crim. P. 4.1, FBI Special Agent Bowman was sworn and attested to the contents of this affidavit in support of the criminal complaint.

_____          Date: May 5, 2025
HON. SHARON A. KING
United States Magistrate Judge

6